Good morning again, Michael J. Truman, appearing before the appellant, Ms. Moreno. Ms. Moreno's appeal raises a very straightforward issue I submit, and that has to do with whether or not, in light of the testimony from the co-conspirator government witness about the limited amount of her involvement and knowledge of the scheme, when viewed against the allegations in the indictment, is whether or not the evidence is sufficient to sustain her conviction. It's clear that the indictment alleges a scheme which, according to the testimony that's uncontradicted by the co-conspirator, Ms. Moreno did not know about and could not have known about, given the nature of the facts and circumstances surrounding the conduct of that co-conspirator and also the nature and circumstances of this particular scheme, as alleged in the indictment. What is it exactly she would have had to know? One of the things I submit she would have had to know is, as alleged in the indictment, that the information about the beneficiaries that she was providing were, in fact, going to be used to create the false medical records and the other false documentation. At that level of detail, or just that it was going to be used to get people medical devices they weren't entitled to? Well, that's not what's alleged in the indictment. The indictment alleges a scheme which has to do with the submission of false information through Cooper Medical to secure various devices. She would at least have to know that that's what was going to be taking place. But the statute surely doesn't require that level of detail. If somebody came to her and said, I want you to go find these people and have them apply for wheelchairs, but they're really not entitled to it, and we're going to get them anyway, would that be enough to violate the statute if she participated in that conspiracy? If the theory was that she was the facts were that she was going to obtain information that she knew was going to be used to submit fraudulent applications, then I think, depending on how the indictment was drawn, the answer to your question, that would be sufficient, because she was acting with a specific intent to defraud. Why does it matter how the indictment was drawn at that level of detail? I thought, I mean, if she, this case went to a jury. They had instructions. If she was guilty, I mean, is your argument a variance argument or something? It sort of looks like a variance argument, but I think that it really is seen in the more direct light of whether or not the evidence is sufficient. Because of the testimony of the co-defendant, when you look at the allegations in the indictment and you look at the testimony of the co-defendant, the only conclusion you can draw is that Ms. Moreno not only did not, but could not have known about the scheme that set out in this particular indictment. Now, if we were talking about a system in which the language in the scheme set out in the indictment doesn't make any difference to a fraud case, and any fraud related to some fraud or conduct is sufficient, then I think I can understand the position that Your Honor is coming from. But that's not what this is about. This is about indictments that allege specific kinds of fraudulent conduct to be conducted in a specific pattern. Now, there may be some other fraud that somebody might engage in, and that kind of fraud may or may not be somewhat similar, but that's not the fraud that's alleged in this particular indictment. So that's the point. The fraud that was alleged, I'm looking at the first part of your brief here, was committing health care fraud by submitting false and fraudulent claims for reimbursement for power wheelchairs. Right? I mean, that's what you're talking about when you're talking about what the indictment alleges? I'm talking about committing health care fraud by submitting false and fraudulent claims for reimbursement for power wheelchairs. And the connection to who is going to be doing that is Cooper Medical. Okay. And other DME purportedly supplied by Cooper. Okay. So why isn't it then enough if it's proven that she was getting information that there's evidence that she knew was going to be used to get people wheelchairs that they weren't entitled to? In other words, there's all sorts of testimony that she was telling people. Well, they'd say, well, I don't need a wheelchair, and she'd say, well, you should get one anyway because, you know, the benefit may not be there in a few years. But all the undisputed evidence is is that those people who she was having those discussions with and herself understood that they were submitting their material to see if those people were accepted. In other words, whether or not their applications were, in fact, going to be recognized. And there were people and there was testimony in the record about the fact that not everybody's applications was accepted. This wasn't a situation in which we're going to get 100% of every person who may want to give us the information a wheelchair. The point was we're going to get your information and we're going to submit it. All her role was was to acquire some really basic information and give it to the co-conspirator. That's it. What he was going to do with it. How it was going to be submitted. Whether or not the doctors were, in fact, going to review it and call people. All of those details she had no knowledge about and could not, according to the co-defendant, of having had any knowledge about. And, in fact, he didn't even know about the Cooper medical connection until after the fact in this case. And what I'm saying is that even though you might go to somebody and say, you don't or you don't appear to me to need whatever the medical services are, doesn't make you a member of a fraudulent scheme with a specific intent to defraud to acquire that information and submit it to someone to see if, in fact, the individual is going to qualify. And that's what she did. And that's what the evidence shows that she did. And the fact that she told somebody, you might apply now because you may need it later, that's not the fraud that's alleged in this indictment. You don't see that language in the indictment. You don't even see these people in the indictment. Under the theory that her conduct constituted fraudulent conduct, then you would have to reach the conclusion that every one of the people she talked to were co-conspirators, not just with her, but in this indictment. And I submit to you that's a stretch that goes way beyond the evidence. Wasn't there other evidence that was, for want of a better word, indicative fraud? In other words, she was contended that she lied to the agent, was contended that she misrepresented herself as being a representative of Social Security, and so on. I mean, why can't the jury kind of put all of this together and infer that she did know the thing that you say she had to know? Because the only person she had contact with, the sole person she had contact with, put on the stand by the government, said she didn't know. She didn't know what? She didn't know anything about the scheme. She didn't know anything about what was going to happen. She didn't know that these were people who were being recruited to get wheelchairs, who weren't entitled to get the wheelchairs. She didn't know what was going to happen. She knew only, and again according to him, that they were submitting paperwork to see if they would qualify. Then why was she lying to agents and telling lies about who she was and telling lies about what the Medicare was going to go out of stock, providing that you had to get them now, and so on? And why was she even going around and recruiting people to apply for Medicare? That's an unusual thing to be doing if it's legitimate. Well, first of all, it's not unusual, and if you want to turn on the television set and give me about 20 minutes, I can get you several stations that are running advertisements right here in Pasadena for people to contact XYZ Company in order to see if they apply for exactly the same power wheelchair we're talking about. They may have the same problem. Anyway, go ahead. If they do, then I'm simply pointing out that in the community, in terms of Your Honor's question, there's nothing unusual about that, number one. And number two, and that is in the record that those things were existing and taking place out there. It's also in the record that there were lots of other people who were out talking to individuals to see if they were interested in applying for wheelchair. But to get back to the point I was making before, not only didn't she know. You didn't answer my other question. I'll stay beside that issue. What about all the other evidence about the fact that she was, for some reason, saying all these things that weren't true, and then telling, when she was interviewed, telling a story that wasn't true? The issue with regard to the interview with the agents is after the fact, by a fair amount of time. And you could look at that and say that's evidence of guilty knowledge then, but that's not what we're talking about here. We're talking about intent to defraud at the time the conduct takes place, number one. Number two, with regard to the evidence of her misrepresenting herself, the evidence is to the contrary. In the idea or the representation by the government that she was representing herself to be from Social Security, et cetera, I pointed out in the reply brief that the record doesn't support those representations. The issue is what was her intent at the time she engaged in the conduct, and that intent, in part, had to include a degree of knowledge. It's undisputed, not only she didn't have, but she couldn't have had. And that's the basis for the arguments that we presented in the report. Did witnesses say that she told them she worked for Social Security or Medicare and were an identification around her neck that said so? No, that's not correct. And if you look through the reply brief, Your Honor, you'll see that I go back to the record with regard to those allegations, and that's not there. Thank you. Unless there are any other questions. Thank you, counsel. May it please the Court, Ellen Meltzer on behalf of the United States. May I just ask about the last question? Counsel said that the allegation that she told people she worked for Social Security or Medicare and were an identification around her neck is not in the record, is it? Your Honor, I apologize to the Court. The references that I gave to the record excerpts in that particular sentence did not support that statement. However, the correct record excerpts are in a different sentence of the brief, and in fact, she told Ms. Moreno told Benita White that she worked for Social Security is on page 98 of the supplemental record excerpts. She told Lydia Martinez that she worked for Medicare is on page 456 of the supplemental record excerpts. They're both in a different sentence of the brief. She told both Ms. Martinez, again on page 456, and Helen May Glenn on page 482 of the supplemental record excerpts. Excuse me. They both testified that she wore a badge around her neck that had her picture on it, suggesting that she worked for a federal agency. So although that one particular sentence that A badge that suggested she worked for a federal agency? Suggesting that she was some kind of official person working. You know, people wear badges around their neck these days because you have to get into an office building and get past security. Well, the badge certainly was not issued by Mr. Adesina in any type of official capacity. One of the witnesses, the beneficiaries, testified that when Ms. Moreno went to her apartment, Ms. Moreno was not wearing any type of identification. And, in fact, she questioned her and said, do you have identification? And Ms. Moreno's reply was, no, I don't. Don't you trust me? And other witnesses then testified that she wore some type of a badge. And it was clearly done to give her some type of indicia of reliability or, you know, working in an official capacity. As is clear that there were multiple evidentiary bases in this case, certainly in the aggregate for sustaining the verdict in this case. As the court has noted, she was going around door to door to two apartment complexes soliciting beneficiaries for free, as she termed them, power wheelchairs. If it's not unusual in this district to have that done, it's only because of the rampant fraud in this industry. She approached Mr. Adesina and offered to supply beneficiaries' names to him, and they agreed on a price of $100 per beneficiary. She identified herself with multiple names. She used Maria. She used Mary. She used Gutierrez. She used Rodriguez. She used various names when going around door to door. Again, she did tell certain beneficiaries that she worked for Medicare or for Social Security. Sotomayor, what in terms of Mr. Tremaine's basic theory, i.e., that she had to know what was exactly what the scheme was, what is your response to that? I don't think that she has to know every detail of the scheme. What does she have to know? She has to know that the information that she is soliciting, collecting, and submitting to Mr. Adesina would be used in some way for beneficiaries to obtain power wheelchairs that were unnecessary. Ms. Marino knew that the government does not just give away free wheelchairs to people who don't need them. And where are you getting that standard from? Is that from conspiracy law or what? In other words, from whence do you do we know what level of knowledge she has? She was alleged to be a co-conspirator, right? The question is, what did she need to know about the conspiracy? She had to know that. And why? What are you basing this on? On general conspiracy law. No, but I want to know, on what legal doctrine or case are you getting the idea of what degree of knowledge she has to have to be a co-conspirator? Excuse me, Your Honor. There is a site here in your brief on page 13 that I see. Excuse me? I see a site on page 13 of your brief that says that she didn't have to know all the details to not participate in all the enterprises of the conspiracy. She doesn't have to be the mastermind of the scheme. She doesn't have to know all of the details on how the claims would be submitted and how the paperwork would follow. But she certainly knew that the people did not need power wheelchairs. The government wasn't just giving them away. She may have ñ she apparently knew that the people had to go through some type of approval process. She didn't have to know what that was. And she saw that the people were ambulatory. She saw that they didn't have mobility problems. They told her they didn't have mobility problems. They told her that they didn't need the power wheelchairs. And yet she knew that all of the names that she submitted, with the exception of one or two, were approved for power wheelchairs. You just gave a list sort of of what she didn't have to know. In other words, she didn't have to know all the details. She didn't have to know who all the participants were. What did she have to know? She had to know. You have to know that there's a conspiracy and you have to agree to join it. So what do you have to know about the conspiracy in order to do those things? She had to know that there was a conspiracy. To do what? To defraud Medicare by obtaining power wheelchairs for beneficiaries who did not need them. Okay. And defense counsel basically says, well, she didn't have any idea that this had anything to do with defrauding Medicare. For all she knew, these applications were going to be submitted. They'd get a thumbs up. They'd get a thumbs down. So what's the evidence that she knew that there was a conspiracy to defraud Medicare? Because she lied to the beneficiaries and told them that, first of all, she told Anita White, who's one of the two witnesses who actually did need a wheelchair and had one to start with, that she could get her a new power wheelchair even though she had been previously denied by Medicare. She told Helen Glenn that if she had a Medicare card, that's all that she needed to be entitled to a power wheelchair. That's on page 480 of the supplemental record excerpts. She told them all similar stories, that Medicare was going to discontinue coverage, that they might need one in the future, that the funds were running out, that the government was just giving them away. These are all lies that she was telling people. I'm not sure that it's a lie that the funds are running out. I've been listening to the TV the past couple weeks. And I don't know who she's defrauding. She told a lady that you got denied once, but I can get you approval the second time. Is she defrauding Medicare or is she defrauding the lady? I think she's defrauding the Medicare. First of all, she got the woman a wheelchair, and she's defrauding the Medicare system if submitting an accurate application for that person would not get them a wheelchair. If they couldn't obtain one by submitting accurate information, it's defrauding Medicare to obtain one by submitting false information. She knew they were going to submit false information because, as I said before, I think using as common sense, the jury could conclude that she knew that the government didn't just give away power wheelchairs to everybody who had a Medicare card. And if the people are ambulatory and the people are mobile, then she has to know that the only way that Medicare is going to approve this is by submitting false claims. Also, wasn't she paid only if the person got approved? Yes. Yes. So, therefore, it was if she thought she was just submitting, they were just submitting to see if they were eligible, then she would be submitting, not thinking she would be getting paid for most of these people because they theoretically wouldn't be approved. And, in fact, she was paid for approximately 38 out of the 40 names that she submitted. She made over $3,000. All of those people got wheelchairs? Yes, Your Honor. There were the testimony was, and on the basis of some of the documents that are in the supplemental record excerpts, I believe that one apartment complex for senior citizens, there were 17 people approved for power wheelchairs and there were 18 at the other. And that's because they submitted false medical information. Correct, Your Honor. Which there isn't any direct knowledge that she knew, but it would be circumstantial. Circumstantial. Yes, Your Honor. And I think as the district court judge recognized at the beginning of. . . You said one complex, there were 17 and there were 18? Yes, at senior citizens. Do you know how many applications were submitted from those complexes? No, Your Honor. So. . . But the testimony was that she was the only marketer who was working those two complexes. I know, but what I was trying to find out was whether 17 out of 35 applications were paid or 17 out of 17. I'm sorry, I can't hear the question. I was trying to find out whether 17 applications out of 17 were paid or 17. . .  I thought you said that she submitted 40 applications and 38 were approved. Approximately. So you do know. So you seem to be saying that. . . I'm confused. There were a few submitted from other locations besides those two apartment complexes. I see. But of the 40 she submitted, 38 were approved. Yes, Your Honor. Approximately. Mr. Adeshina testified that one or two of her beneficiaries were turned down after the claims were submitted. And she was the only person working at these complexes? That was the testimony. Which reminds that if only a total of two were turned down, then 17 out of 71, 17 out of 16. . . 17 out of 16 out of 17. She was working them really hard. The testimony was that she was there constantly and that people just saw her going door to door, door to door. In fact, the manager of the Aldebary Apartments, which was one of the senior citizen complexes, testified that it really created a problem with the trash dumpsters from all these deliveries because there were so many cardboard boxes and foam padding and papers from all the wheelchairs that were being delivered. Everybody knew what was going on. Because I'm curious. Does the record actually show that there's TV ads telling people to apply for these wheelchairs? I don't know, Your Honor. There certainly were not TV ads in connection with this case, Your Honor. It was just her going door to door knocking on the apartments. Unless the Court has any other questions, the government submits. All right. You're out of time. We'll give you a minute. Thank you, Your Honor. It's not true that the record shows that Ms. Moreno was the only person working this particular complex. In fact, we not only put on the testimony showing that there was at least one other person. We had a photograph of that one other person, and that one other person who was involved came to court, although we were not allowed to call her as a witness, but she was identified in the courtroom, both by Mr. Anishina and by the manager of the apartment complex. What's the relevance now? The government wants to attribute numbers to my client under the theory that she's the only player. I thought that's not what they were doing. I understood, maybe I'm confused, that the number they gave me was the number of applications that were submitted from the people she recruited. Well, 40 she recruited and 38 were approved. Is that not accurate? Am I quarreling with that number? It's the number that the government counsel referred to coming out of a particular complex. So what difference does that make? It makes a difference in terms of your understanding of what the evidence was in the case with regard to my client's conduct. It's one thing if you say my client's the only person at a particular location. It's another, and X number of things come out of that location. It's another thing to say out of the total universe of applications, and what the court doesn't have is how many applications in total were submitted through Cooper Medical, for example. And of those, the 40 isn't a correct number is coming from my client because that number includes other DME providers who are not alleged in the indictment. Let me ask you, is there a denial that Cooper Medical submitted fraudulent applications? No. That was not challenged at trial. And finally, with regard to this issue concerning the badge, the testimony is not that the badge was, whatever my client was wearing had anything on it other than her name. And there's no use by that to infer that she was representing any governmental entity in her testimony. But there was evidence. I looked back at what you said in your brief, and what you said was you made a broad statement, but then you said it wasn't, it didn't say that on those pages. And counsel says it's true it didn't say that on those pages about her saying she was representing, worked for Social Security or Medicare, but it said so on other pages. Do you disagree with that? Your Honor, that brief's been on file a long time. If the government wanted to correct it, they could have corrected it. I'm asking you, is it not true? And I don't know without taking those babies. Did you look at the record? I'm sorry, Your Honor? I mean, you wrote it in a very specific way. You just said it wasn't on those pages. So I'm asking you whether you know whether it's on different pages. And I don't know whether or not it's on different pages. And the only way I would know that is the same way that I put together the material I put in the reply brief, which is to go back and look. And the first time any of us have heard that representation was within the last 10 minutes. Thank you, Your Honor. Okay. The charge will be submitted.
judges: Kennelly, Reinhardt, Berzon